# NATIONAL ASSOCIATION FOR THE ADVANCE-MENT OF COLORED PEOPLE v. ALABAMA EX REL. PATTERSON, ATTORNEY GENERAL.

No. 91.   Argued January 15–16, 1958.—Decided June 30, 1958.

450

*Robert L. Carter* argued the cause for petitioner. With him on the brief were *Thurgood Marshall, Arthur D. Shores, William T. Coleman, Jr., George E. C. Hayes, William R. Ming, Jr., James M. Nabrit, Jr., Louis H. Pollak* and *Frank D. Reeves.*

*Edmon L. Rinehart,* Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief were *John Patterson,* Attorney General, and *MacDonald Gallion* and *James W. Webb,* Assistant Attorneys General.

MR. JUSTICE HARLAN delivered the opinion of the Court.

We review from the standpoint of its validity under the Federal Constitution a judgment of civil contempt entered against petitioner, the National Association for the Advancement of Colored People, in the courts of Alabama. The question presented is whether Alabama, consistently with the Due Process Clause of the Fourteenth Amendment, can compel petitioner to reveal to the State's Attorney General the names and addresses of all its Alabama members and agents, without regard to their positions or functions in the Association. The judgment of contempt was based upon petitioner's refusal to comply fully with a court order requiring in part the production of membership lists. Petitioner's claim is that the order, in the circumstances shown by this record, violated rights assured to petitioner and its members under the Constitution.

Alabama has a statute similar to those of many other States which requires a foreign corporation, except as exempted, to qualify before doing business by filing its corporate charter with the Secretary of State and designating a place of business and an agent to receive service of process. The statute imposes a fine on a corporation transacting intrastate business before qualifying and provides for criminal prosecution of officers of such a corporation. Ala. Code, 1940, Tit. 10, §§ 192–198. The National Association for the Advancement of Colored People is a nonprofit membership corporation organized under the laws of New York. Its purposes, fostered on a nationwide basis, are those indicated by its name,* and it oper-

---

*The Certificate of Incorporation of the Association provides that its ". . . principal objects . . . are voluntarily to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interest of colored citizens; to

ates through chartered affiliates which are independent unincorporated associations, with membership therein equivalent to membership in petitioner. The first Alabama affiliates were chartered in 1918. Since that time the aims of the Association have been advanced through activities of its affiliates, and in 1951 the Association itself opened a regional office in Alabama, at which it employed two supervisory persons and one clerical worker. The Association has never complied with the qualification statute, from which it considered itself exempt.

In 1956 the Attorney General of Alabama brought an equity suit in the State Circuit Court, Montgomery County, to enjoin the Association from conducting further activities within, and to oust it from, the State. Among other things the bill in equity alleged that the Association had opened a regional office and had organized various affiliates in Alabama; had recruited members and solicited contributions within the State; had given financial support and furnished legal assistance to Negro students seeking admission to the state university; and had supported a Negro boycott of the bus lines in Montgomery to compel the seating of passengers without regard to race. The bill recited that the Association, by continuing to do business in Alabama without complying with the qualification statute, was ". . . causing irreparable injury to the property and civil rights of the residents and citizens of the State of Alabama for which criminal prosecution and civil actions at law afford no adequate relief . . . ." On the day the complaint was filed, the Circuit Court issued *ex parte* an order restraining the Association, *pendente lite,* from engaging in

secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law."

further activities within the State and forbidding it to take any steps to qualify itself to do business therein.

Petitioner demurred to the allegations of the bill and moved to dissolve the restraining order. It contended that its activities did not subject it to the qualification requirements of the statute and that in any event what the State sought to accomplish by its suit would violate rights to freedom of speech and assembly guaranteed under the Fourteenth Amendment to the Constitution of the United States. Before the date set for a hearing on this motion, the State moved for the production of a large number of the Association's records and papers, including bank statements, leases, deeds, and records containing the names and addresses of all Alabama "members" and "agents" of the Association. It alleged that all such documents were necessary for adequate preparation for the hearing, in view of petitioner's denial of the conduct of intrastate business within the meaning of the qualification statute. Over petitioner's objections, the court ordered the production of a substantial part of the requested records, including the membership lists, and postponed the hearing on the restraining order to a date later than the time ordered for production.

Thereafter petitioner filed its answer to the bill in equity. It admitted its Alabama activities substantially as alleged in the complaint and that it had not qualified to do business in the State. Although still disclaiming the statute's application to it, petitioner offered to qualify if the bar from qualification made part of the restraining order were lifted, and it submitted with the answer an executed set of the forms required by the statute. However petitioner did not comply with the production order, and for this failure was adjudged in civil contempt and fined $10,000. The contempt judgment provided that the fine would be subject to reduction or remission if compliance

were forthcoming within five days but otherwise would be increased to $100,000.

At the end of the five-day period petitioner produced substantially all the data called for by the production order except its membership lists, as to which it contended that Alabama could not constitutionally compel disclosure, and moved to modify or vacate the contempt judgment, or stay its execution pending appellate review. This motion was denied. While a similar stay application, which was later denied, was pending before the Supreme Court of Alabama, the Circuit Court made a further order adjudging petitioner in continuing contempt and increasing the fine already imposed to $100,000. Under Alabama law, see *Jacoby* v. *Goetter, Weil & Co.*, 74 Ala. 427, the effect of the contempt adjudication was to foreclose petitioner from obtaining a hearing on the merits of the underlying ouster action, or from taking any steps to dissolve the temporary restraining order which had been issued *ex parte,* until it purged itself of contempt. But cf. *Harrison* v. *St. Louis & S. F. R. Co.*, 232 U. S. 318; *Hovey* v. *Elliott,* 167 U. S. 409.

The State Supreme Court thereafter twice dismissed petitions for certiorari to review this final contempt judgment, the first time, 91 So. 2d 221, for insufficiency of the petition's allegations and the second time on procedural grounds. 265 Ala. 349, 91 So. 2d 214. We granted certiorari because of the importance of the constitutional questions presented. 353 U. S. 972.

## I.

We address ourselves first to respondent's contention that we lack jurisdiction because the denial of certiorari by the Supreme Court of Alabama rests on an independent nonfederal ground, namely, that petitioner in applying for certiorari had pursued the wrong appellate

remedy under state law.  Respondent recognizes that our jurisdiction is not defeated if the nonfederal ground relied on by the state court is "without any fair or substantial support," *Ward* v. *Board of County Commissioners,* 253 U. S. 17, 22.  It thus becomes our duty to ascertain, ". . . in order that constitutional guaranties may appropriately be enforced, whether the asserted non-federal ground independently and adequately supports the judgment." *Abie State Bank* v. *Bryan,* 282 U. S. 765, 773.

The Alabama Supreme Court held that it could not consider the constitutional issues underlying the contempt judgment which related to the power of the State to order production of membership lists because review by certiorari was limited to instances ". . . where the court lacked jurisdiction of the proceeding, or where on the face of it the order disobeyed was void, or where procedural requirements with respect to citation for contempt and the like were not observed, or where the fact of contempt is not sustained . . . ."  265 Ala., at 353, 91 So. 2d, at 217.  The proper means for petitioner to obtain review of the judgment in light of its constitutional claims, said the court, was by way of mandamus to quash the discovery order prior to the contempt adjudication.  Because of petitioner's failure to pursue this remedy, its challenge to the contempt order was restricted to the above grounds.  Apparently not deeming the constitutional objections to draw into question whether "on the face of it the order disobeyed was void," the court found no infirmity in the contempt judgment under this limited scope of review.  At the same time it did go on to consider petitioner's constitutional challenge to the order to produce membership lists but found it untenable since membership lists were not privileged against disclosure pursuant to reasonable state demands and since the privilege against self-incrimination was not available to corporations.

We are unable to reconcile the procedural holding of the Alabama Supreme Court in the present case with its past unambiguous holdings as to the scope of review available upon a writ of certiorari addressed to a contempt judgment. As early as 1909 that court said in such a case, *Ex parte Dickens,* 162 Ala. 272, at 276, 279–280, 50 So. 218, at 220, 221:

> "Originally, on certiorari, only the question of jurisdiction was inquired into; but this limit has been removed, and now the court 'examines the law questions involved in the case which may affect its merits.' . . .
>
> . . . . .
>
> ". . . [T]he judgment of this court is that the proper way to review the action of the court in cases of this kind is by certiorari, and not by appeal.
>
> "We think that certiorari is a better remedy than mandamus, because the office of a 'mandamus' is to require the lower court or judge to act, and not 'to correct error or to reverse judicial action,' . . . whereas, in a proceeding by certiorari, errors of law in the judicial action of the lower court may be inquired into and corrected."

This statement was in full accord with the earlier case of *Ex parte Boscowitz,* 84 Ala. 463, 4 So. 279, and the practice in the later Alabama cases, until we reach the present one, appears to have been entirely consistent with this rule. See *Ex parte Wheeler,* 231 Ala. 356, 358, 165 So. 74, 75–76; *Ex parte Blakey,* 240 Ala. 517, 199 So. 857; *Ex parte Sellers,* 250 Ala. 87, 88, 33 So. 2d 349, 350. For example, in *Ex parte Morris,* 252 Ala. 551, 42 So. 2d 17, decided as late as 1949, the petitioner had been held in contempt for his refusal to obey a court order to produce names of members of the Ku Klux Klan. On writ of certiorari, constitutional grounds were urged in part for

reversal of the contempt conviction. In denying the writ of certiorari, the Supreme Court concluded that petitioner had been accorded due process, and in explaining its denial the court considered and rejected various constitutional claims relating to the validity of the order. There was no intimation that the petitioner had selected an inappropriate form of appellate review to obtain consideration of all questions of law raised by a contempt judgment.

The Alabama cases do indicate, as was said in the opinion below, that an order requiring production of evidence ". . . *may* be reviewed on petition for mandamus." 265 Ala., at 353, 91 So. 2d, at 217. (Italics added.) See *Ex parte Hart,* 240 Ala. 642, 200 So. 783; cf. *Ex parte Driver,* 255 Ala. 118, 50 So. 2d 413. But we can discover nothing in the prior state cases which suggests that mandamus is the *exclusive* remedy for reviewing court orders after disobedience of them has led to contempt judgments. Nor, so far as we can find, do any of these prior decisions indicate that the validity of such orders can be drawn in question by way of certiorari only in instances where a defendant had no opportunity to apply for mandamus. Although the opinion below suggests no such distinction, the State now argues that this was in fact the situation in all of the earlier certiorari cases, because there the contempt adjudications, unlike here, had followed almost immediately the disobedience to the court orders. Even if that is indeed the rationale of the Alabama Supreme Court's present decision, such a local procedural rule, although it may now appear in retrospect to form part of a consistent pattern of procedures to obtain appellate review, cannot avail the State here, because petitioner could not fairly be deemed to have been apprised of its existence. Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitu-

tional rights. Cf. *Brinkerhoff-Faris Co.* v. *Hill*, 281 U. S. 673.

That there was justified reliance here is further indicated by what the Alabama Supreme Court said in disposing of petitioner's motion for a stay of the first contempt judgment in this case. This motion, which was filed prior to the final contempt judgment and which stressed constitutional issues, recited that "[t]he only way in which the [Association] can seek a review of the validity of the order upon which the adjudication of contempt is based [is] by filing a petition for Writ of Certiorari in this Court." In denying the motion, 265 Ala. 356, 357, 91 So. 2d 220, 221, the Supreme Court stated:

> "It is the established rule of this Court that the proper method of reviewing a judgment for civil contempt of the kind here involved is by a petition for common law writ of certiorari . . . .
>
> "But the petitioner here has not applied for writ of certiorari, and we do not feel that the petition [for a stay] presently before us warrants our interference with the judgment of the Circuit Court of Montgomery County here sought to be stayed."

We hold that this Court has jurisdiction to entertain petitioner's federal claims.

## II.

The Association both urges that it is constitutionally entitled to resist official inquiry into its membership lists, and that it may assert, on behalf of its members, a right personal to them to be protected from compelled disclosure by the State of their affiliation with the Association as revealed by the membership lists. We think that petitioner argues more appropriately the rights of its members, and that its nexus with them is sufficient to permit that it act as their representative before this

Court. In so concluding, we reject respondent's argument that the Association lacks standing to assert here constitutional rights pertaining to the members, who are not of course parties to the litigation.

To limit the breadth of issues which must be dealt with in particular litigation, this Court has generally insisted that parties rely only on constitutional rights which are personal to themselves. *Tileston* v. *Ullman,* 318 U. S. 44; Robertson and Kirkham, Jurisdiction of the Supreme Court (1951 ed.), § 298. This rule is related to the broader doctrine that constitutional adjudication should where possible be avoided. See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346–348 (concurring opinion). The principle is not disrespected where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court. See *Barrows* v. *Jackson,* 346 U. S. 249, 255–259; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 183–187 (concurring opinion).

If petitioner's rank-and-file members are constitutionally entitled to withhold their connection with the Association despite the production order, it is manifest that this right is properly assertable by the Association. To require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion. Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical. The Association, which provides in its constitution that "[a]ny person who is in accordance with [its] principles and policies . . ." may become a member, is but the medium through which its individual members seek to make more effective the expression of their own views. The reasonable likelihood that the Association itself through diminished financial support and membership may be adversely

affected if production is compelled is a further factor pointing towards our holding that petitioner has standing to complain of the production order on behalf of its members. Cf. *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–536.

### III.

We thus reach petitioner's claim that the production order in the state litigation trespasses upon fundamental freedoms protected by the Due Process Clause of the Fourteenth Amendment. Petitioner argues that in view of the facts and circumstances shown in the record, the effect of compelled disclosure of the membership lists will be to abridge the rights of its rank-and-file members to engage in lawful association in support of their common beliefs. It contends that governmental action which, although not directly suppressing association, nevertheless carries this consequence, can be justified only upon some overriding valid interest of the State.

Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Thomas* v. *Collins,* 323 U. S. 516, 530. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. See *Gitlow* v. *New York,* 268 U. S. 652, 666; *Palko* v. *Connecticut,* 302 U. S. 319, 324; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Staub* v. *City of Baxley,* 355 U. S. 313, 321. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the

effect of curtailing the freedom to associate is subject to the closest scrutiny.

The fact that Alabama, so far as is relevant to the validity of the contempt judgment presently under review, has taken no direct action, cf. *De Jonge* v. *Oregon, supra; Near* v. *Minnesota,* 283 U. S. 697, to restrict the right of petitioner's members to associate freely, does not end inquiry into the effect of the production order. See *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402. In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action. Thus in *Douds,* the Court stressed that the legislation there challenged, which on its face sought to regulate labor unions and to secure stability in interstate commerce, would have the practical effect "of discouraging" the exercise of constitutionally protected political rights, 339 U. S., at 393, and it upheld the statute only after concluding that the reasons advanced for its enactment were constitutionally sufficient to justify its possible deterrent effect upon such freedoms. Similar recognition of possible unconstitutional intimidation of the free exercise of the right to advocate underlay this Court's narrow construction of the authority of a congressional committee investigating lobbying and of an Act regulating lobbying, although in neither case was there an effort to suppress speech. *United States* v. *Rumely,* 345 U. S. 41, 46–47; *United States* v. *Harriss,* 347 U. S. 612, 625–626. The governmental action challenged may appear to be totally unrelated to protected liberties. Statutes imposing taxes upon rather than prohibiting particular activity have been struck down when perceived to have the consequence of unduly curtailing the liberty of freedom of press assured under the Fourteenth Amendment. *Grosjean* v. *American*

*Press Co.,* 297 U. S. 233; *Murdock* v. *Pennsylvania,* 319 U. S. 105.

It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. When referring to the varied forms of governmental action which might interfere with freedom of assembly, it said in *American Communications Assn.* v. *Douds, supra,* at 402: "A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature." Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs. Cf. *United States* v. *Rumely, supra,* at 56–58 (concurring opinion).

We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and

its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

It is not sufficient to answer, as the State does here, that whatever repressive effect compulsory disclosure of names of petitioner's members may have upon participation by Alabama citizens in petitioner's activities follows not from *state* action but from *private* community pressures. The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold.

We turn to the final question whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association. See *American Communications Assn.* v. *Douds, supra,* at 400; *Schneider* v. *State,* 308 U. S. 147, 161. Such a ". . . subordinating interest of the State must be compelling," *Sweezy* v. *New Hampshire,* 354 U. S. 234, 265 (concurring opinion). It is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.

It is important to bear in mind that petitioner asserts no right to absolute immunity from state investigation, and no right to disregard Alabama's laws. As shown by its substantial compliance with the production order, petitioner does not deny Alabama's right to obtain from it such information as the State desires concerning the pur-

poses of the Association and its activities within the State. Petitioner has not objected to divulging the identity of its members who are employed by or hold official positions with it. It has urged the rights solely of its ordinary rank-and-file members. This is therefore not analogous to a case involving the interest of a State in protecting its citizens in their dealings with paid solicitors or agents of foreign corporations by requiring identification. See *Cantwell* v. *Connecticut, supra,* at 306; *Thomas* v. *Collins, supra,* at 538.

Whether there was "justification" in this instance turns solely on the substantiality of Alabama's interest in obtaining the membership lists. During the course of a hearing before the Alabama Circuit Court on a motion of petitioner to set aside the production order, the State Attorney General presented at length, under examination by petitioner, the State's reason for requesting the membership lists. The exclusive purpose was to determine whether petitioner was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question. The issues in the litigation commenced by Alabama by its bill in equity were whether the character of petitioner and its activities in Alabama had been such as to make petitioner subject to the registration statute, and whether the extent of petitioner's activities without qualifying suggested its permanent ouster from the State. Without intimating the slightest view upon the merits of these issues, we are unable to perceive that the disclosure of the names of petitioner's rank-and-file members has a substantial bearing on either of them. As matters stand in the state court, petitioner (1) has admitted its presence and conduct of activities in Alabama since 1918; (2) has offered to comply in all respects with the state qualification statute, although pre-

serving its contention that the statute does not apply to it; and (3) has apparently complied satisfactorily with the production order, except for the membership lists, by furnishing the Attorney General with varied business records, its charter and statement of purposes, the names of all of its directors and officers, and with the total number of its Alabama members and the amount of their dues. These last items would not on this record appear subject to constitutional challenge and have been furnished, but whatever interest the State may have in obtaining names of ordinary members has not been shown to be sufficient to overcome petitioner's constitutional objections to the production order.

From what has already been said, we think it apparent that *Bryant* v. *Zimmerman,* 278 U. S. 63, cannot be relied on in support of the State's position, for that case involved markedly different considerations in terms of the interest of the State in obtaining disclosure. There, this Court upheld, as applied to a member of a local chapter of the Ku Klux Klan, a New York statute requiring any unincorporated association which demanded an oath as a condition to membership to file with state officials copies of its ". . . constitution, by-laws, rules, regulations and oath of membership, together with a roster of its membership and a list of its officers for the current year." N. Y. Laws 1923, c. 664, §§ 53, 56. In its opinion, the Court took care to emphasize the nature of the organization which New York sought to regulate. The decision was based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence, which the Court assumed was before the state legislature when it enacted the statute, and of which the Court itself took judicial notice. Furthermore, the situation before us is significantly different from that in *Bryant,* because the organization there had made no effort to comply with

any of the requirements of New York's statute but rather had refused to furnish the State with *any* information as to its local activities.

We hold that the immunity from state scrutiny of membership lists which the Association claims on behalf of its members is here so related to the right of the members to pursue their lawful private interests privately and to associate freely with others in so doing as to come within the protection of the Fourteenth Amendment. And we conclude that Alabama has fallen short of showing a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have. Accordingly, the judgment of civil contempt and the $100,000 fine which resulted from petitioner's refusal to comply with the production order in this respect must fall.

### IV.

Petitioner joins with its attack upon the production order a challenge to the constitutionality of the State's *ex parte* temporary restraining order preventing it from soliciting support in Alabama, and it asserts that the Fourteenth Amendment precludes such state action. But as noted above, petitioner has never received a hearing on the merits of the ouster suit, and we do not consider these questions properly here. The Supreme Court of Alabama noted in its denial of the petition for certiorari that such petition raised solely a question pertinent to the contempt adjudication. "The ultimate aim and purpose of the litigation is to determine the right of the state to enjoin petitioners from doing business in Alabama. That question, however, is not before us in this proceeding." 265 Ala., at 352, 91 So. 2d, at 216. The proper method for raising questions in the state appellate courts pertinent to the underlying suit for an injunction appears

to be by appeal, after a hearing on the merits and final judgment by the lower state court. Only from the disposition of such an appeal can review be sought here.

For the reasons stated, the judgment of the Supreme Court of Alabama must be reversed and the case remanded for proceedings not inconsistent with this opinion.

*Reversed.*